UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| KELSEY MURPHY, on behalf of herself and all Others similarly situated, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) |
| HEALTH CARE SERVICE CORPORATION d/b/a BLUE CROSS AND BLUE SHIELD OF ILLINOIS. | ) ) ) ) |
| Defendant. | ) ) |

Case No. 22-cv-2656

Hon. LaShonda A. Hunt

**MEMORANDUM OPINION AND ORDER**

Plaintiff Kelsey Murphy ("Plaintiff") brings this class action complaint against her health insurance provider, Defendant Health Care Service Corporation d/b/a Blue Cross Blue Shield of Illinois ("Blue Cross"), challenging its policy governing access to fertility treatments. Plaintiff alleges the Blue Cross policy intentionally discriminates against her and other LGBTQ participants based on sexual orientation, by imposing additional out-of-pocket costs on them that heterosexual participants do not have to incur in order to qualify for fertility benefits. Blue Cross has moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6). For the reasons that follow, Defendant's Motion to Dismiss [15] is denied.

**BACKGROUND**

Plaintiff is a 32-year-old woman who, since 2014, has been covered by a Blue Cross policy that includes services "rendered in connection with the diagnosis and/or treatment of infertility." (Dkt. 1 at ¶¶ 17, 19-20). Like many other LGBTQ individuals, Plaintiff and her partner desire to have children; however, they cannot conceive through sexual intercourse and must therefore rely

1

on fertility treatments such as intrauterine insemination ("IUI") and in vitro fertilization ("IVF"). (*Id.* at ¶ 2). In summer 2020, Plaintiff attempted to become pregnant through intra-cervical insemination; those efforts did not result in a pregnancy. (*Id.* at ¶ 33). In fall 2020, Plaintiff began IVF treatment but was later informed by her doctor's office that Blue Cross had denied coverage due to her not meeting the required criteria under its health insurance policy. Faced with an out-of-pocket cost of $10,650 for IVF treatment, Plaintiff decided not to continue. (*Id.* at ¶¶ 34-36). The following summer, Plaintiff started IVF treatment again and was informed once more that those treatments would not be covered under her Blue Cross policy. (*Id.* at ¶ 37). She became pregnant through IVF but miscarried at eight weeks. (*Id.* at ¶¶ 38-39). As a result of the coverage denial by Blue Cross, Plaintiff and her partner had to pay up front out-of-pocket for fertility treatments. (*Id.* at ¶ 41).

Plaintiff alleges that the Blue Cross policy discriminates against individuals based on their sexual orientation or gender identity in violation of 42 U.S.C. § 18116(a) because it "requires them to pay out-of-pocket for fertility treatments as a prerequisite to receiving coverage for such services." (*Id.* at ¶¶ 40, 57-59). Furthermore, she alleges, these are costs imposed on LGBTQ participants that heterosexual participants did not have to pay. (*Id.* at ¶¶ 20, 26-27).

As an initial matter, the parties disagree on the precise policy language that applied to Plaintiff during the relevant time period. Under the policy in effect in 2010, which is attached to Plaintiff's complaint ("2010 Policy"), infertility is defined as:

> [T]he inability to conceive a child after one year of unprotected sexual intercourse or the inability to sustain a successful pregnancy. The one year requirement will be waived if your Physician determines that a medical condition exists that renders conception impossible through unprotected sexual intercourse, including but not limited to, congenital absence of the uterus or ovaries, absence of the uterus or ovaries due to surgical removal due to a medical condition, involuntary sterilization due to Chemotherapy or

2

>radiation treatments; or, efforts to conceive as a result of one year of medically based and supervised methods of conception, including artificial insemination, have failed and are not likely to lead to a successful pregnancy.

(Dkt. 1 at ¶ 21).

According to Defendant, the applicable policy changed during the relevant time period, and the policy in effect in 2020 and thereafter ("2020 Policy"), when Plaintiff was undergoing fertility treatment, defined infertility as follows (with the changes in bold):

>Infertility means the inability to conceive a child after one year of unprotected sexual intercourse, **the inability to conceive after one year of attempts to produce conception, the inability to conceive after an individual is diagnosed with a condition affecting fertility, or the inability to attain or maintain a viable pregnancy or sustain a successful pregnancy.** The one year requirement will be waived if your Physician determines that a medical condition exists that renders conception impossible through unprotected sexual intercourse, including but not limited to, congenital absence of the uterus or ovaries, absence of the uterus or ovaries due to surgical removal due to a medical condition, involuntary sterilization due to Chemotherapy or radiation treatments; or, efforts to conceive as a result of one year of medically based and supervised methods of conception, including artificial insemination, have failed and are not likely to lead to a successful pregnancy.

(Dkt. 16 at 3). Significantly, both the 2010 and 2020 policies define "unprotected sexual intercourse" as "sexual union between a male and a female, without the use of any process, device, or method that prevents conception." (Dkt. 1 at ¶ 22).

Defendants contend in their motion to dismiss that the 2020 policy identifies multiple ways for Plaintiff and other LGBTQ participants to qualify for fertility benefits, and thus the complaint fails to state a claim for intentional sex discrimination. Plaintiff counters that even if the 2020 policy controls, like the 2010 policy, it unfairly requires participants in same-sex relationships to

3

shoulder certain costs prior to becoming eligible for coverage of fertility treatments. The motion is fully briefed and ripe for resolution.

## LEGAL STANDARD

A motion to dismiss pursuant to Rule 12(b)(6) for failure to state a claim tests the sufficiency of the complaint, not its merits. *Skinner v. Switzer*, 562 U.S. 521, 529–30, 131 S. Ct. 1289, 179 L. Ed. 2d 233 (2011). When considering dismissal of a complaint, the Court accepts all well-pleaded factual allegations as true and draws all reasonable inferences in favor of the Plaintiff. *See Erickson v. Pardus*, 551 U.S. 89, 94, 127 S. Ct. 2197, 167 L. Ed. 2d 1081 (2007) (per curiam). To survive a motion to dismiss, a Plaintiff must "state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). A complaint is facially plausible when the Plaintiff alleges "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009).

## DISCUSSION

Section 1557 of the Affordable Care Act ("ACA"), 42 U.S.C. § 18116(a), states that "[t]he enforcement mechanisms provided for and available under" Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681 *et seq.*) apply to violations of the ACA. Title IX "implies a private right of action to enforce its prohibition on intentional sex discrimination." *Briscoe v. Health Care Serv. Corp.* 281 F. Supp. 3d 725, 738 (N.D. Ill. 2017) (quoting *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173, 125 S.Ct. 1497, 161 L.Ed.2d 361 (2005)). In light of the Supreme Court's ruling in *Bostock v. Clayton County, GA*, 140 S. Ct. 1731 (2020), the United States Department of Health and Human Services has stated that it "will interpret and enforce Section 1557's prohibition on discrimination on the basis of sex to include: 1) Discrimination on the basis

4

of sexual orientation; and 2) discrimination on the basis of gender identity." U.S. Dept. of Health and Human Servs., Notification of Interpretation and Enforcement of Section 1557 of the Affordable Care Act and Title IX of the Education Amendments of 1972, 86 Fed. Reg. 27984 (May 25, 2021). Both parties likewise appear to agree that the prohibition against intentional sex discrimination in Title IX encompasses sexual orientation.[1] Still, Blue Cross asserts that Plaintiff has not plausibly alleged a claim under the ACA based on the facts in the instant case.

First, Blue Cross argues that the complaint should be dismissed because the 2010 Policy was no longer valid at the time Plaintiff began to seek infertility treatment, and as a result, Plaintiff should have brought her claims under the 2020 Policy. However, when evaluating a motion to dismiss, the Court must take all of Plaintiff's allegations as true, and the complaint here alleges the 2010 Policy was in place during the relevant time period. (Dkt. 1 at ¶ 3). Although the start date of the 2020 Policy is listed as July 1, 2020 (arguably before Plaintiff began fertility treatment), the Court is not in a position at this stage of the litigation to determine when Plaintiff's coverage ended under the 2010 Policy. More importantly, Blue Cross has not challenged Plaintiff's contention that the 2010 policy was discriminatory on its face, which would be reason alone for the Court to deny its motion. Nevertheless, because it may turn out that the 2020 Policy is the operative document and the briefs of both parties focus exclusively on the impact of that policy, the Court will undertake an analysis of the arguments.[2]

---

[1] The Court is aware of the decision in *Neese v. Becerra*, Case No. 2:21-cv-163-Z, 2022 WL 16902425 (N.D. Tex. Nov. 11, 2022) holding that *Bostock* does not apply to Section 1557 or Title IX. Here, Defendant has not cited that case, let alone suggested that section 1557 excludes discrimination based on sexual orientation. The Court therefore respectfully declines to follow *Neese*.

[2] While this motion has been pending, the parties have proceeded with discovery. To the extent Plaintiff determines that the 2010 Policy was not in effect during the relevant time period, the complaint will need to be amended. Accordingly, a telephonic status hearing will be set by separate order to discuss further scheduling dates.

Blue Cross maintains that the added language in the 2020 Policy, *supra* at p. 3, renders it non-discriminatory. Indeed, Blue Cross insists that there are at least six ways for any member, regardless of sexual orientation, to qualify for infertility benefits: (1) a year of unprotected sexual intercourse; (2) inability to conceive after one year of attempts to produce conception; (3) inability to conceive after an individual is diagnosed with a condition affecting fertility; (4) inability to attain a viable pregnancy; (5) inability to maintain a viable pregnancy; or (6) inability to sustain a successful pregnancy. (Dkt. 20 at pp. 9-10). But a hypothetical example of two similarly-situated participants illustrates the flaw in Blue Cross' reasoning.

Participant A is a single woman in a heterosexual relationship with a male partner who turns out to be sterile. Participant A previously got pregnant and gave birth in a prior relationship with a different man, and she is otherwise healthy and able to get pregnant, stay pregnant, and give birth. Participant B is a single woman in a same-sex relationship with a female partner. Participant B previously got pregnant using IVF (which was covered by Participant B's prior health insurance, for the sake of the example) and gave birth. Participant B is likewise otherwise healthy and able to get pregnant, stay pregnant, and give birth.

Participant A can establish her infertility under the 2020 Policy by having unprotected sex with her male partner for one year and not conceiving a child due to his sterility. Participant A will not incur any out-of-pocket fertility costs in that year before her coverage is approved. Participant B, on the other hand, cannot qualify for infertility treatment without incurring out-of-pocket costs. She cannot show that she is unable to conceive a child after one year of unprotected sexual intercourse, because the Blue Cross policies define that term as sexual union between a man and a woman and the sexual orientation of Participant B is such that she does not have sex with men. Participant B has not been diagnosed with a condition affecting fertility. And she cannot

6

prove the inability to conceive after one year of attempts to produce conception.[3]  Crucially, Participant B *can* "attain or maintain a viable pregnancy or sustain a successful pregnancy."  In fact, she has done it once before.[4]

Because Participant B cannot prove that she is infertile under any of the listed definitions, she must seek a waiver of the so-called "one year requirement."  She cannot have a physician determine "that a medical condition exists that renders conception impossible through unprotected sexual intercourse" because she has no such condition.  Alternatively, she must show that "efforts to conceive as a result of one year of medically based and supervised methods of conception . . . have failed and are not likely to lead to a successful pregnancy."  Doing so will likely require out-of-pocket expenditures.  In other words, Participant A can qualify for infertility treatment without incurring any monetary costs while Participant B is forced to pay for one year of medically supervised methods of conception to qualify for interfertility treatment because her sexual orientation forecloses the other options to her.

Perhaps anticipating this conundrum, Blue Cross argues that "specifically under the plain language of Plaintiff's Plan, a covered individual in a same-sex relationship – like Plaintiff – would be considered to have an 'inability to attain a viable pregnancy' and therefore would meet the definition of Infertility and qualify for infertility benefits by virtue of being in a same sex relationship." (Dkt. 16 at 6).  The Court disagrees.  As a matter of contractual interpretation, the plain language does not support an inference that participants in same-sex relationships fall within that exception.  The clause does not place any limits on the ways participants may prove an

---

[3] Neither side attempts to define this clause, but the Court notes that any attempt for a same-sex couple to "produce conception" necessarily requires third-party assistance that will incur out-of-pocket costs.

[4] The Court does not believe that this analysis is necessarily limited to a woman who has previously gotten pregnant and given birth.  As discussed below, the phrase "attain or maintain a viable pregnancy or sustain a successful pregnancy" has no qualifications and, if read according to its plain language, would exclude many women in same-sex relationships with no impediments to childbearing.

inability to attain a viable pregnancy. It does not say, for instance, inability to attain a viable pregnancy "without medical intervention" or "inability to attain, maintain, or sustain a pregnancy due to sexual orientation." In fact, the plain language contains no qualifiers whatsoever. As previously noted, many women in same-sex relationships are able to attain, maintain, and sustain pregnancies, but they typically require medical assistance to start the process. Contrary to Defendant's untenable assertion, any such woman would not automatically qualify as infertile under the plain language of the plan.

Case in point here. Plaintiff has alleged that she was denied fertility benefits under the terms of her Blue Cross policy. If it were true that a covered individual in a same-sex relationship satisfies the "infertility" definition, Blue Cross should have covered Plaintiff's IVF treatment instead of forcing her to pay out-of-pocket. Although not required at the motion to dismiss phase of a case, the Court notes that Blue Cross has not attempted to explain why Plaintiff was denied fertility benefits if she would have been considered unable to attain a viable pregnancy and, therefore, infertile under the 2020 Policy.

Finally, Blue Cross contends that the complaint should be dismissed because it does not allege the intentional discrimination required to make out a claim under Title IX and the ACA. To survive a motion to dismiss, Plaintiff must adequately allege that sex was "the motivating factor" behind the discrimination she faced. *Doe v. Purdue Univ.*, 928 F.3d 652, 667-68. The Court finds Plaintiff's complaint meets this standard. Plaintiff explicitly alleges that Blue Cross deliberately and openly discriminates against LGBTQ individuals. (Dkt. 1 at ¶¶ 6-11). Moreover, the language of the policy defines "unprotected sexual intercourse" as "sexual union between a male and a female." (*Id.* at ¶ 22.) It is reasonable to infer that the policy intentionally discriminates against LGBTQ members by excluding them from a cost-free method of demonstrating they meet

8

the definition of infertility. While it may be difficult for Plaintiff to prove intentional discrimination, she has adequately alleged it, and the Court will not dismiss her complaint on this basis.

In the end, the fact that the 2020 Policy may have at least six different ways a participant can meet the definition of infertility is not dispositive of whether the policy discriminates against LGBTQ individuals. The problem identified in Plaintiff's complaint is that the policy is written such that a significant portion of LGBTQ community—women who are healthy and could attain, maintain, and sustain a pregnancy—cannot meet the definition of infertility without incurring out-of-pocket costs, whereas their straight counterparts can. Because Plaintiff has adequately alleged that the policy discriminates against those people based only on their sexual orientation, the Court denies the motion to dismiss.

## **CONCLUSION**

For all the foregoing reasons, Defendant's Motion to Dismiss [15] is denied.

**IT IS SO ORDERED.**

Date: 10/17/23

_____
LaShonda A. Hunt
United States District Judge